# In the United States Court of Federal Claims

No. 22-867C
(Filed: May 12, 2023)

```
*************************************
JOSHUA J. ANGEL,                  *
                                  *
            Plaintiff,            *
                                  *
      v.                          *
                                  *
THE UNITED STATES,                *
                                  *
            Defendant.            *
*************************************
```

RCFC 12(b)(1); RCFC 12(b)(6); Statute of Limitations, 28 U.S.C. § 2501; Claim Accrual; Continuing Claim Doctrine; Claims Foreclosed by Binding Precedent

Joshua J. Angel, New York, NY, for plaintiff.

Anthony F. Schiavetti, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this suit, plaintiff Joshua J. Angel asserts his own claims and those of a putative class against the United States.  His claims are founded on the dividend rights of shareholders of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or collectively, "the Enterprises."  Defendant, relying on Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), moves to dismiss his claims as untimely and also because some of his claims are foreclosed by binding precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  See Fairholme Funds, Inc. v. United States, 26 F.4th 1274 (Fed. Cir. 2022), cert. denied, 143 S. Ct. 563, and cert. denied sub nom. Barrett v. United States, 143 S. Ct. 562, and cert. denied sub nom. Owl Creek Asia I, L.P. v. United States, 143 S. Ct. 563, and cert. denied sub nom. Cacciapalle v. United States, 143 S. Ct. 563 (2023).  As explained below, the court grants defendant's motion.

## I.  BACKGROUND

### A.  Fannie Mae and Freddie Mac Shareholders Stop Receiving Dividends

Mr. Angel, like many other plaintiffs who filed claims in this court, seeks compensation for changes to the benefits of owning stock in Fannie Mae and Freddie Mac that occurred in the

context of a government rescue of the Enterprises.[1]  As recounted by the Federal Circuit:

> The Enterprises suffered devastating financial losses in 2008 when the national housing market collapsed.  In response, Congress enacted the Housing and Economic Recovery Act of 2008 (HERA).  HERA created the Federal Housing Finance Agency (FHFA), an independent agency tasked with regulating the Enterprises and (if necessary) stepping in as conservator or receiver.  12 U.S.C. §§ 4511, 4617.  HERA also contains a Succession Clause, which states that the FHFA "shall, as conservator or receiver . . . immediately succeed to [ ] all rights, titles, powers, and privileges of the [Enterprises], and of any stockholder . . . with respect to the [Enterprises] and the assets of the [Enterprises]."  Id. § 4617(b)(2)(A)(i).

> With the consent of the Enterprises' boards of directors, the FHFA's Director placed the Enterprises into conservatorship in September 2008.  The FHFA Director then negotiated preferred stock purchase agreements (PSPAs) with the Department of Treasury (Treasury) in which Treasury agreed to allow the Enterprises to draw up to $100 billion in capital in exchange for:  (1) senior preferred non-voting stock having quarterly fixed-rate dividends and an initial liquidation preference of $1 billion and (2) warrants to purchase up to 79.9% of the common stock of each Enterprise at a nominal price.

> FHFA and Treasury amended the terms of the original PSPAs in the years that followed. . . .  [The Third Amendment implemented] a "net worth sweep" under the PSPAs[, which] replaced the fixed-rate dividend formula with a variable one that required the Enterprises to make quarterly payments equal to their entire net worth, minus a small capital reserve amount.  The net worth sweep caused the Enterprises to transfer most, if not all, of their equity to Treasury, leaving no residual value that could be distributed to shareholders.

Id. at 1282-83 (alterations in first paragraph in original) (citations to appellate joint appendix omitted).  The Third Amendment to the PSPAs was adopted on August 17, 2012.  Compl. ¶ 10; accord Collins v. Yellen, 141 S. Ct. 1761, 1773 n.7 (2021).  Mr. Angel's claims are founded on his dividend rights, as a holder of Junior Preferred shares in Fannie Mae and Freddie Mac, and on the fact that no dividends were declared or paid to holders of Junior Preferred shares from January 1, 2013, to the date his complaint was filed, August 8, 2022.[2]  Compl. ¶¶ 11, 17-20, 22,

---

[1]  The facts recounted in this section are derived from the complaint and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.

[2]  According to the complaint, Mr. Angel "owns Junior Preferred Shares of both Fannie Mae and Freddie Mac in amount in excess of $1 million face amount [sic]."  Compl. ¶ 22. However, Mr. Angel fails to identify either the date or price of his stock purchases.  The information that Mr. Angel fails to provide would have shown whether he owned his shares prior to the implementation of the net worth sweep or whether he speculated in the Enterprises' stock

47, 51, 56-57.

## B. Fannie Mae and Freddie Mac Shareholders File Numerous Suits

As noted by the Federal Circuit, "[s]hareholders launched a series of challenges to the net worth sweep that have worked their way through several fora, including the [United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit")] and the [United States] Supreme Court." Fairholme, 26 F.4th at 1283.  In addition, "[p]arallel to these unsuccessful attempts to undo the net worth sweep, shareholders filed complaints with the [United States Court of Federal Claims ("Court of Federal Claims")]." Id.  Many of the suits in this court were filed in 2013 or 2014, within six years of the Enterprises entering the conservatorships. See, e.g., Wash. Fed. v. United States, 149 Fed. Cl. 281, 287, 297 (2020) (dismissing suit, filed in 2013, for compensation based on the conservatorships imposed by the FHFA), aff'd, 26 F.4th 1253 (Fed. Cir. 2022); Cacciapalle v. United States, 148 Fed. Cl. 745, 754, 781 (2020) (dismissing suit, filed in 2013, for compensation based on the net worth sweep), aff'd sub nom. Fairholme, 26 F.4th at 1274.  A second wave of suits was filed when almost six years had passed since the net worth sweep was implemented. See, e.g., Owl Creek Asia I, L.P. v. United States, 148 Fed. Cl. 614, 622, 646 (2020) (dismissing suit, filed in 2018, for compensation based on the net worth sweep), aff'd sub nom. Fairholme, 26 F.4th at 1274.  In the appeals before it, the Federal Circuit ruled that shareholder claims based on the net worth sweep could not proceed in this court. See Fairholme, 26 F.4th at 1282 (resolving eight appeals of decisions of this court in one opinion).

## C. Mr. Angel Files His First Two Suits Related to His Fannie Mae and Freddie Mac Stock

In 2018, proceeding pro se, Mr. Angel filed suit in the United States District Court for the District of Columbia ("District Court"), alleging that the Third Amendment was a breach of contract and a breach of the implied covenant of good faith and fair dealing. See Angel v. Fed. Home Loan Mortg. Corp., No. CV 18-1142, 2019 WL 1060805, at *1-2 (D.D.C. Mar. 6, 2019) (noting that Mr. Angel brought claims for breach of contract, breach of the implied covenant, and tortious interference, but abandoned the third claim), aff'd, 815 F. App'x 566 (D.C. Cir. 2020). The District Court dismissed Mr. Angel's claims related to the net worth sweep as untimely because they were barred under state law by statutes of limitation that require that suits be filed within either three or five years of the accrual of the claim. Id. at *2-7.  After the District Court dismissed his case, it also denied his motion for leave to amend his complaint. Angel v. Fed. Home Loan Mortg. Corp., No. CV 18-1142, 2019 WL 11320986, at *1 (D.D.C. May 24, 2019), aff'd, 815 F. App'x 566.  The D.C. Circuit affirmed both of those opinions in a single, unpublished decision. See Angel, 815 F. App'x at 569-70 (holding that "[t]here are no other facts consistent with Angel's complaint that would make his claims, which accrued upon the adoption of the Third Amendment in 2012, timely").  That decision issued on April 24, 2020.

---

afterward.  By withholding this information, Mr. Angel impedes an in-depth analysis of his claims.  At the end of the day, Mr. Angel's reticence is of no moment because, as explained herein, the court's statute of limitations and binding Federal Circuit precedent foreclose his claims, regardless of when he purchased his shares in the Enterprises.

Less than two months later, again proceeding pro se, Mr. Angel filed a suit in this court. As in the District Court, he alleged that the implementation of the net worth sweep was a breach of contract and a breach of the implied covenant of good faith and fair dealing.  Compl. ¶¶ 10-17, 40, 50-51, 55, Angel v. United States, No. 20-737C (Fed. Cl. June 12, 2020).  On August 4, 2022, Mr. Angel, who was no longer proceeding pro se but as an attorney admitted to the bar of this court, voluntarily dismissed the action.

### D. Mr. Angel Files His Third Suit Based on the Same Underlying Facts

Four days after voluntarily dismissing the earlier suit filed in this court, Mr. Angel filed his current complaint.  The complaint is not a model of clarity but generally restates the facts that were alleged in his prior suits and revises the language describing his theories of recovery.  He sets forth three causes of action.

### 1. Breach of Contract – Count I

The title of Count I of the complaint is "Quarterly Breaches of Contract."  Compl. 13. The underlying contract is described by Mr. Angel as an "Implicit Guaranty," where "Treasury implicitly guaranteed Fannie Mae[] and Freddie Mac Junior Preferred dividends."  Id. ¶¶ 44-45; see also id. ¶ 46 (asserting the existence of "Junior Preferred shareholder contract rights").  Mr. Angel describes the contract breach as "Treasury's quarterly actions preventing the [Enterprises'] board[s] of directors from complying with their obligations under the [Certificates of Designation of shares in the Enterprises] and the Implicit Guaranty . . . ."  Id. ¶ 46.  Mr. Angel further alleges that "[s]uch quarterly Treasury actions beginning January 1, 2013, caused Fannie Mae Junior Preferred shares to suffer damages for contractual breach of approximately $20 billion to date." [3]  Id. ¶ 47.

Mr. Angel does not explain the nature of the contract underlying "Junior Preferred shareholder contract rights," id. ¶ 46, or adequately identify the contract provision that has been breached, see RCFC 9(k) ("In pleading a claim founded on a contract or treaty, a party must identify the substantive provisions of the contract or treaty on which the party relies.").  However, his brief responding to the government's motion to dismiss includes two relevant clarifications.  First, Mr. Angel argues that the contract with Treasury underlying Count I is an implied-in-fact contract.  Pl.'s Resp. 1 ("Plaintiff alleges that each fiscal quarter since 2012, Defendant breached its implied-in-fact contractual obligations to the Plaintiff . . . ."), 5 (noting that when a plaintiff in this court "claims that the Government has breached an implied-in-fact contract, it need only make a plausible claim of a contract with the government" (citing Spectre Corp. v. United States, 132 Fed. Cl. 626, 629 (2017)), 20 (captioning a section of his brief as "Plaintiff's Complaint Plausibly Alleges the Existence of an Implicit Contract Between the Government and Shareholders Guarantying Payment of Dividends"); 24 (stating that a case before this court also "involve[d] a Plaintiff's allegation of an implied in fact contract that

---

[3]  Consistent with other sections of the complaint, the court believes that Mr. Angel intended to reference the shareholders of both Fannie Mae and Freddie Mac in this paragraph. See Compl. ¶¶ 44, 46, 49.

guaranteed Government reimbursement of Plaintiff's losses" (citing Moda Health Plan, Inc v. United States, 130 Fed. Cl. 436 (2017), rev'd, 892 F.3d 1311 (Fed. Cir. 2018), rev'd sub nom. Me. Cmty. Health Options v. United States, 140 S. Ct. 1308 (2020))).  Second, he explains the relevance of his reference in the complaint to the Certificates of Designation of shares in the Enterprises:

> The Certificates of Designation of Fannie Mae and Freddie Mac Junior Preferred stock, respectively subject to Virginia and Delaware corporate governance law, create quarterly dividend periods.  Both the Certificate of Designation and applicable state corporate governance law require directors of corporations whose stock provide for quarterly dividends to make that dividend determination every quarter.

Pl.'s Resp. 6.

The court is guided by two principles in its attempt to discern the nature of the claim in Count I.  First, an "implied-in-fact contract has terms just like an express, written contract." Frymire v. United States, 51 Fed. Cl. 450, 460 (2002).  Second, to state a claim for breach of contract, a plaintiff must identify a specific term of the contract that has been breached.  See, e.g., Atlas Corp. v. United States, 895 F.2d 745, 754 (Fed. Cir. 1990) (noting that a contract breach claim requires the plaintiff to point to the "specific [contract] provision that was breached"); San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989) (noting that to state a claim for breach of contract, a plaintiff in this court must allege that the contract imposed a duty on the government and that the government breached that duty); Grady v. United States, 124 Fed. Cl. 278, 280-81 (2015) ("An implied-in-fact contract is founded upon a meeting of the minds regarding specific terms of an agreement . . . ."), aff'd, 656 F. App'x 498 (Fed. Cir. 2016); Garreaux v. United States, 77 Fed. Cl. 726, 730 (2007) ("[T]here is a minimum burden for Plaintiff, in asserting a breach of contract claim, to explicitly identify the provisions and terms of the contract that have been breached.").

Working backwards from the purported breach—described as "Treasury's quarterly actions preventing the [Enterprises'] board[s] of directors from complying with their obligations" to make quarterly dividend determinations, Compl. ¶ 46—under the implied-in-fact contract alleged in the complaint Mr. Angel must be contending that Treasury had a contractual duty to not impede quarterly dividend determinations by the boards of the Enterprises.  This interpretation of Count I is consistent with the description of the claims in Count I and Count II provided by Mr. Angel in his response brief:

> In Counts I and II of the Complaint, Plaintiff alleges that each fiscal quarter from January 1, 2013, until August 8, 2022, the Defendant breached Plaintiff's contract rights by instructing the [boards] of Fannie Mae and Freddie Mac to disregard Plaintiff's contract dividend rights by not considering whether to request Treasury approval of a declaration of a Junior Preferred stock dividend for that fiscal quarter.

Pl.'s Resp. 1.

The claim in Count I, therefore, relies on two propositions. The first is that Treasury and Mr. Angel were parties to an implied-in-fact contract guaranteeing dividends to the holders of Junior Preferred shares in the Enterprises. See Compl. ¶ 44 (stating that "Treasury implicitly guaranteed Fannie Mae[] and Freddie Mac Junior Preferred dividends"). The second is that the implied-in-fact contract was breached when Treasury interfered with the quarterly dividend determinations of the boards of the Enterprises. See id. ¶ 46 (identifying the breach as "Treasury's quarterly actions preventing the [Enterprises'] board[s] of directors from complying with their obligations under the [Certificates of Designation of shares in the Enterprises] and the Implicit Guaranty"). Although other interpretations of Count I of the complaint are possible, this interpretation appears to reflect Mr. Angel's theory of recovery for Count I.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing – Count II

The title of Count II of the complaint is "Quarterly Breaches of Implied Covenant of Good Faith and Fair Dealing." Id. at 14. The underlying contract for this claim is described by Mr. Angel as the "Treasury guaranty of Fannie Mae[] and Freddie Mac Junior Preferred share payments." Id. ¶ 49. Mr. Angel asserts that the implied covenant "requires each party to avoid unreasonable or bad-faith conduct that would deprive the other parties of the fruits of the contract" and "to deal reasonably, fairly, and in good faith in the discharge of their respective contractual duties." Id. ¶¶ 49-50. The covenant was breached, according to Mr. Angel, because "Treasury committed willful, bad-faith, and unreasonable breaches of its payment guaranty implied covenant, quarter by quarter after January 1, 2013[,] in effecting the [Enterprises'] directors' outsized profit sweep dividends of approximately $18 billion to date to [Treasury's] Senior Preferred shares." Id. ¶ 51.

The only specific breach mentioned in Count II of the complaint is Treasury's "effecting" dividend payments each quarter to Treasury rather than to the Junior Preferred shareholders. Id. There is no reference to quarterly dividend determinations by the boards of the Enterprises. Thus, although in his response brief Mr. Angel lumps Counts I and II together as concerning Treasury's repeated instructions to the boards to "disregard" his right to quarterly dividend determinations, Pl.'s Resp. 1, the text of Count II of the complaint focuses more narrowly on the payment of dividends to Treasury instead of to the Junior Preferred shareholders, Compl. ¶ 51.

Because Mr. Angel's implied covenant claim references, without specificity, "the fruits of the contract" and Treasury's "contractual duties," id. ¶¶ 49-50, the court turns again to Mr. Angel's response brief to better understand the alleged implied-in-fact contract. It is apparent from this document that, in Mr. Angel's view, the United States guaranteed that Junior Preferred shareholders would be paid dividends notwithstanding the government's rescue of the Enterprises. See Pl.'s Resp. 1 (stating that "actions and communications by the Government create[ed] an implicit guarantee of dividend rights"), 9 ("Defendant's actions prior to the 2008 conservatorship created a general market perception of an implied guaranty of quarterly dividend payments to the holders of Junior Preferred stock."), 15 ("Defendant's breach of Plaintiff's dividend rights in the first quarter of 2013 'left intact the rights' that Plaintiff had to dividends in

every other subsequent fiscal quarter."), 24 (stating that this case involves an "allegation of an implied in fact contract that guaranteed Government reimbursement of Plaintiff's losses"). At the conclusion of his brief, Mr. Angel describes how the implied-in-fact contract, i.e., the "payment guaranty" mentioned in Count II of the complaint, Compl. ¶ 51, was formed:

> [T]he Government showed mutuality to contract by offering an implicit guarantee of Junior Preferred dividend rights. . . . Plaintiff alleges []that the parties exchanged consideration[]—that Plaintiff bought Junior Preferred stock []in exchange for the Government's promise[] to guarantee dividend rights. Under Plaintiff's theory, the Government []extended an offer for a unilateral contract[] that government-regulated financial institutions and individuals like Angel could accept by buying Fannie Mae and Freddie Mac Junior Preferred stock.

Pl.'s Resp. 25. In essence, then, Mr. Angel's implied covenant claim rests on the allegation that an implied-in-fact contract imposed a duty on the part of the United States to guarantee his dividends from the Enterprises, and that Treasury's bad-faith conduct "quarter by quarter after January 1, 2013," Compl. ¶ 51, deprived him of the fruits of this implied-in-fact contract with the United States.

### 3. Wrongful Acts in Conducting the Conservatorships – Count III

The title of Count III of the complaint is "Quarterly Wrongful Acts in Conducting Conservatorship." Id. at 15. This is the least coherent claim in the complaint. One theme in Count III appears to be that Treasury, through the FHFA, owes a fiduciary duty to the Junior Preferred shareholders of the Enterprises. See id. ¶ 55 ("A conservator of an entity owes a fiduciary duty, not only to the creditors of that entity, but also to the owners of that entity."); id. ¶ 56 ("Treasury engaged in wrongful acts in conducting the Conservatorship, by each quarter directing and otherwise causing [the Enterprises'] directors to disregard Junior Preferred contractual payment rights and effecting quarterly outsized sweeps of [the Enterprises'] profits, inclusive of approximately $20 billion of Junior Preferred share contractual dividend rights to itself."). It is possible, therefore, that Count III presents a claim for breach of fiduciary duty by the United States acting as conservator for the Enterprises. The final numbered paragraph in Count III resists interpretation, however:

> In effecting these quarterly unauthorized sweeps, Treasury rendered the $33 billion of [the Enterprises'] Junior Preferred shares principal outstanding incapable of payment breach restoration without Defendant's eschew of statute of limitations and agreement to make whole interest payment at conservatorship end, and thus mandatory in damages payment in connection with this action.

Id. ¶ 57. The court therefore turns to Mr. Angel's response brief for a possible clarification of the claim presented in Count III.

Unfortunately, Mr. Angel's brief provides little help in understanding Count III. Certainly, Mr. Angel disavows that this claim is a tort claim. See Pl.'s Resp. 4 (rejecting

defendant's contention that his claims sound in tort).  But he nowhere argues that the complaint includes a claim for breach of fiduciary duty.  Instead, there is a long and meandering discussion of Treasury's wrongful acts that allegedly deprived Mr. Angel of dividends.  One paragraph in the brief appears to summarize his "wrongful acts" claim:

> Plaintiff also alleges in Count III of the Complaint that the Treasury engaged in wrongful acts in conducting the Conservatorship of the [Enterprises] by causing their [boards] to disregard the contractual payment rights of Junior Preferred Shareholders.  These wrongful quarterly breaches of Plaintiff's contract rights resulted in wrongful quarterly extractions.

Id. at 1.

The significance of Mr. Angel's use of the term "extraction" in this matter is unclear.  When alleging that the government effectuated "wrongful quarterly extractions," it is apparent that Mr. Angel is referring to the quarterly net worth sweep instituted by the Third Amendment.  Accord id. ("The 39 extractions were wrongful because each extraction violated the very terms of the Third Amendment.").  He uses the term in the complaint as well, asserting that the Third Amendment resulted in a "5th amendment illegal extraction."  Compl. ¶ 7 n.4.  Elsewhere in his response brief, Mr. Angel argues that his allegations of "wrongful quarterly extractions" are like the "wrongful extractions" pled in another case before this court.  Pl.'s Resp. 4 (citing Owl Creek Asia I, 148 Fed. Cl. at 640).  However, the claims in the referenced case were for illegal exactions, not extractions.  Owl Creek Asia I, 148 Fed. Cl. at 622, 639-40.

An illegal exaction occurs when "the Government has the citizen's money in its pocket, and pleads the illegal acts of its officials as an excuse for keeping it there."  Clapp v. United States, 117 F. Supp. 576, 580 (Ct. Cl. 1954); see also Gulley v. United States, 150 Fed. Cl. 405, 418 (2020) (stating that a plaintiff asserting an illegal exaction claim must allege that he "is entitled to recover money for the government's purported illegal action").  An illegal exaction claim is commonly characterized as a constitutional claim, Fairholme, 26 F.4th at 1287, because the exaction violates the due process guarantees of the Fifth Amendment to the United States Constitution, see Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1363 (Fed. Cir. 2002) (stating that an "illegal exaction under the Due Process clause exists only if money has been 'improperly exacted or retained' by the government" (quoting United States v. Testan, 424 U.S. 392, 401 (1976))).  Mr. Angel states in his response brief that none of his claims is constitutional in nature.  Pl.'s Resp. 5.  Thus, it is not clear whether Mr. Angel is using the term "extraction" as a synonym for exaction, or to illustrate some other concept.

In sum, the legal theory underlying Count III remains elusive.  Mr. Angel alleges that Treasury committed wrongful acts, but not torts.  On the one hand, Mr. Angel implies that Treasury's wrongful actions were repeated breaches of the government's fiduciary duty to the Enterprises' shareholders.  Compl. ¶¶ 55-56.  On the other hand, he implies that Treasury's wrongful actions were breaches of contract—a duplicative restatement of the claims in Count I and Count II of the complaint.  See id. ¶ 56 ("Treasury engaged in wrongful acts in conducting the Conservatorship, by each quarter directing and otherwise causing [the Enterprises'] directors

to disregard Junior Preferred contractual payment rights and effecting quarterly outsized sweeps of [the Enterprises'] profits, inclusive of approximately $20 billion of Junior Preferred share contractual dividend rights to itself."). The court will examine various potential interpretations of Count III in light of the arguments in favor of dismissal raised by defendant.

### E.  Defendant's Principal Arguments for Dismissal

Defendant relies on several authorities to argue that the complaint should be dismissed.[4] Foremost among these are the six-year statute of limitations for claims filed in this court, 28 U.S.C. § 2501, and the binding precedent of Fairholme, 26 F.4th at 1274, which firmly rejected shareholder claims against the United States related to the net worth sweep.  On the topic of timeliness, defendant asserts that because the Third Amendment "was agreed to in August 2012," Mr. Angel's claims "needed to be filed by August 2018 to fall within this Court's statute of limitations." Def.'s Mot. 15.  On the topic of the viability of Mr. Angel's claims, had they been timely filed, defendant states that "Mr. Angel's claims share the same substance as those that the Federal Circuit has unequivocally rejected in Fairholme, which the Supreme Court has now made final through its denial of certiorari.  Mr. Angel's claims, therefore, cannot prevail and should be dismissed." Id. at 26.  Because defendant's motion to dismiss is fully briefed and there is no need for oral argument, this matter is ripe for resolution by the court.

## II.  LEGAL STANDARDS

### A.  RCFC 12(b)(1)

With respect to a motion to dismiss brought pursuant to RCFC 12(b)(1), the plaintiff bears the burden of establishing, by a preponderance of evidence, that the court possesses subject-matter jurisdiction over his claims. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  In determining whether subject-matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Id.  However, the court is not limited to the pleadings in considering subject-matter jurisdiction. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014).  If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  RCFC 12(b)(6)

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief. See Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  To survive an RCFC 12(b)(6) motion to dismiss, a plaintiff must

---

[4]  The court omits many of defendant's arguments here in recognition of the clarifications of the complaint provided by Mr. Angel in his response brief.

include in his complaint "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  In other words, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).  Finally, although the court must "accept as true all of the factual allegations contained in the complaint," <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citing <u>Twombly</u>, 550 U.S. at 555-56), legal conclusions in the complaint are not presumed to be true, <u>Iqbal</u>, 556 U.S. at 678.

## III.  ANALYSIS

### A.  All of Mr. Angel's Claims Are Barred Because They Are Untimely

To fall within the court's jurisdiction, a claim against the United States must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501; <u>accord</u> <u>John R. Sand & Gravel Co. v. United States</u>, 552 U.S. 130, 133-35 (2008) (providing that the limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a claim).  "A claim first accrues within the meaning of the statute of limitations 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" <u>Brown Park Ests.-Fairfield Dev. Co. v. United States</u>, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (quoting <u>Brighton Vill. Assocs. v. United States</u>, 52 F.3d 1056, 1060 (Fed. Cir. 1995)).  However, a "claim only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability." <u>John R. Sand & Gravel Co. v. United States</u>, 457 F.3d 1345, 1356 (Fed. Cir. 2006), <u>aff'd</u>, 552 U.S. at 130; <u>see also</u> <u>Young v. United States</u>, 529 F.3d 1380, 1385 (Fed. Cir. 2008) ("It is a plaintiff's knowledge of the facts of the claim that determines the accrual date.").

Mr. Angel's complaint presents two distinct timeliness questions.  The more general question is whether Mr. Angel's claims accrued at the time the Third Amendment instituted the net worth sweep, or at the time of "39 separate and discrete quarterly wrongs, each of which occurred when the Defendant breached its contract with the Plaintiff by instructing the boards that fiscal quarter not to consider whether to declare a dividend to Junior Preferred stock for that fiscal quarter." Pl.'s Resp. 2; <u>see also</u> Compl. ¶ 19 ("The Complaint is anchored in Treasury's wrongful actions, each and every quarter beginning first quarter of 2013, of preventing the [Enterprises' boards] from declaring Junior Preferred share dividends.").  The more limited question is whether, even assuming a quarterly accrual of Mr. Angel's claims, some of those quarterly claims accrued more than six years before the complaint was filed and thus are barred as untimely.

The narrower question is easily resolved, because even Mr. Angel appears to admit that any quarterly breach that occurred before August 8, 2016, is barred by 28 U.S.C. § 2501 because he did not file this suit until August 8, 2022.  See Pl.'s Resp. 18 (asserting that "the Court has jurisdiction to reach the merits of . . . [Mr. Angel's] complaint to the extent that these individual claims accrued on or after [August 8, 2016.]" (alterations in original)).  Because there is no dispute that Mr. Angel's claims founded on government actions taken between August 12, 2012,

and August 8, 2016, are untimely, those claims must be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1).  The court now turns to the broader claim accrual inquiry.

### 1.  Mr. Angel's Claims Accrued by Early 2013

Mr. Angel's rights to dividends from the Enterprises were changed when the Third Amendment implemented the net worth sweep.  That Mr. Angel knew or should have known of the damage to his dividend rights by early 2013, at the latest, is shown by the factual allegations in the complaint.  See Compl. ¶ 7 n.4 (asserting that the Third Amendment "unilaterally changed" dividends from the Enterprises so that Treasury would obtain a "quarterly sweep of all profits," and thus constituted a "breach of Treasury's in fact contractual guaranty of [the Enterprises'] share payments, quarter by quarter beginning January 1, 2013"); id. ¶ 13 (stating that the implementation of the net worth sweep permitted the United States "to convert any of the Junior Preferred share economic (i.e., payment) entitlements to themselves without payment of fair consideration, [constituting a] de facto conversion of approximately $20 billion of [the Enterprises'] contractual dividend entitlement from [the Enterprises] to Treasury from January 1, 2013 to date"); id. ¶ 17 ("Treasury, commencing first quarter 2013 and each quarter thereafter, caused the [the Enterprises'] directors to disregard Junior Preferred contractual quarterly dividend rights."); id. ¶¶ 19, 56 (describing the wrongful government actions underlying Count III of the complaint as beginning in the first quarter of 2013 and continuing quarterly thereafter); id. ¶¶ 47, 51 (stating that the claims in Counts I and II of the complaint are founded on government actions beginning in 2013).  All of the events fixing the government's liability had occurred by early 2013, Mr. Angel could have filed suit at that time, and, thus, his claims accrued at that time.  Accord Brown Park, 127 F.3d at 1455.

Federal Circuit precedent supports this conclusion.  For example, in cases concerning the government's contractual duty to adjust housing subsidies annually to reflect increases in market rents, the plaintiffs' claims for breach accrued the year the requisite adjustment did not occur.  Id.; Brighton Village, 52 F.3d at 1060.  In a financial services case, a claim for breach of the government's promise that an asset could be used by a thrift institution for twenty-five years accrued when the government changed the asset rules after only four years and the thrift was forced to comply with regulatory capitalization requirements without the asset.  See Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) (stating that the plaintiff's claim "accrued when [the plaintiff] should have known that it had been damaged by the government's breach"); see also Shane v. United States, 161 F.3d 723, 726 (Fed. Cir. 1998) (stating that the breach claim of shareholders of a thrift institution accrued, at the latest, when the government announced that it was changing the asset rules and no longer would allow the promised use of the asset).  These decisions confirm that Mr. Angel's claims accrued when he knew or should have known that his dividend rights had been damaged by Treasury's action, whether the implementation of the net worth sweep is characterized as a breach of an implied-in-fact contract, a breach of the implied covenant of good faith and fair dealing, a breach of fiduciary duty, or as a wrongful government act.

Mr. Angel filed his complaint on August 8, 2022.  Because his claims all accrued by early 2013, more than six years before he filed his complaint, they are time-barred by 28 U.S.C.

§ 2501 and must be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1).  However, Mr. Angel attempts to avoid this conclusion by advancing two arguments in support of an accrual date, or dates, within the statute of limitations.  The court addresses both arguments, finding neither to be persuasive.

## 2.  The "Last Requisite Fact" Concept Does Not Change the Accrual of Mr. Angel's Claims

Mr. Angel first argues that the "last requisite fact" concept applies to limitations questions under 28 U.S.C. § 2501.  Pl.'s Resp. 12-14 (citing Note, Developments in the Law— Statutes of Limitations, 63 Harv. L. Rev. 1177, 1200 (1950)).  According to the article referenced by Mr. Angel, for statutes of limitation "legislatures have adopted a concept, developed in the substantive law, delineating that combination of facts or events which permits maintenance of a lawsuit; the time of occurrence of the last of these requisite facts is thereby made the critical point of initial inquiry" for determining the accrual of claims.  Developments in the Law—Statutes of Limitations, 63 Harv. L. Rev. at 1200.  There is no obvious distinction between this concept and the rule cited in Brown Park:  a claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action."  127 F.3d at 1455 (quoting Brighton Village, 52 F.3d at 1060).  And, if there were a distinction, the court would be required to follow Brown Park in any event.

To support the proposition that his claims accrued each fiscal quarter from early 2013 through August 2022, Mr. Angel argues that the Enterprises' boards could have made a dividend determination in any fiscal quarter, and that the last requisite fact for a breach-of-contract claim did not occur until each of those quarterly dividend determinations was not made:

> It was the Defendant's action in the first quarter of 2013 in instructing the [boards] of Fannie Mae and Freddie Mac not to consider whether to declare a quarterly dividend to Junior Preferred stock for that fiscal quarter that was the breach of Plaintiff's contract dividend declaration rights for that quarter, [Compl. ¶¶ 46, that was the last requisite fact.  And, in the following 38 fiscal quarters it was Defendant's action in each of the following 38 quarters in instructing the [boards] of Fannie Mae and Freddie Mac not to consider whether to declare a quarterly dividend to Junior Preferred stock for that fiscal quarter that was the breach of Plaintiff's contract dividend declaration rights for each of the 38 quarters.

Pl.'s Resp. 15.  The court disagrees that Mr. Angel's claims accrued quarterly, rather than by early 2013.  Once Mr. Angel knew or should have known of the damage to his dividend rights caused by the net worth sweep in early 2013, his claims accrued because he could have maintained a suit at that time.  The binding decisions of Brown Park, Brighton Village, Ariadne, and Shane are all on point and compel this result.

## 3.  The Continuing Claim Doctrine Does Not Apply to Mr. Angel's Claims

Mr. Angel also relies on the continuing claim doctrine to set the accrual date for his claims.[5]  The doctrine has its roots in pay cases decided by the Court of Federal Claims' predecessor court, the United States Court of Claims.  See, e.g., Friedman v. United States, 310 F.2d 381, 384 (Ct. Cl. 1962) ("Over the years, the court's pay cases (military and civilian) concerned with the issue of limitations have often applied the so-called 'continuing claim' theory, i.e., periodic pay claims arising more than six years prior to suit are barred, but not those arising within the six-year span even though the administrative refusal to pay the sum claimed may have occurred, or the statute on which the claim is grounded may have been enacted, prior to six years."); Bevevino v. United States, 87 Fed. Cl. 397, 404 (2009) (stating that "the accrual of pay claims for federal workers may sometimes be determined not by the general rule associating claims accrual with a single landmark event, but by the 'continuing claims' doctrine"); Oenga v. United States, 83 Fed. Cl. 594, 615 (2008) (stating that the doctrine "has been applied in certain pay cases, on the grounds that each failure to pay the proper amount gave rise to a new claim"); Baka v. United States, 74 Fed. Cl. 692, 695-97 & nn.4-5 (2006) (finding that the doctrine saved the pay claims in that case but noting that the doctrine is more often applicable in suits challenging the quantum of pay received than in suits where no pay was received at all).

In Brown Park, a seminal decision, the Federal Circuit identified the key elements of the doctrine.  "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  Brown Park, 127 F.3d at 1456.  The doctrine cannot apply, however, when a claim is "based upon a single distinct event, which may have continued ill effects later on."  Id.

Mr. Angel invokes the continuing claim doctrine and references the application of the doctrine in Baka.  Pl.'s Resp. 16-18.  He argues that his claims, like those in Baka, are capable of being divided into discrete wrongs, and concludes that each of his quarterly claims should be deemed to have accrued "in the quarter in which the Government instructed the [boards] of Fannie Mae and Freddie Mac not to consider the declaration of dividends to Plaintiff and other holders of Junior Preferred stock for that quarter."  Id. at 17.  The court does not agree.  The continuing claim doctrine is not always applicable to claims for sums that were not received over a number of months or years.

For an example of a claim that accrued at the time of a single, distinct event, even though the government action had lingering ill effects for the plaintiff over time, the Federal Circuit in Brown Park referenced Hart v. United States, 910 F.2d 815 (Fed. Cir. 1990).  Brown Park, 127 F.3d at 1456.  The Hart decision is instructive in this matter.

The plaintiff in Hart filed suit eight years after her husband's death.  910 F.2d at 816. Her claim was for a monthly survivor's benefit that her husband, a retired member of the

---

[5]  The monikers "continuing claim doctrine" and "continuing claims doctrine" have been used interchangeably by courts.  Compare Brown Park, 127 F.3d at 1456 ("continuing claim doctrine"), with Ariadne, 133 F.3d at 879 ("continuing claims doctrine").

military, did not elect to provide for her.  Id. at 816-17.  It was undisputed that the United States was required by statute to give notice to the plaintiff of her husband's election decision and that the government failed to give such notice.  Id. at 818.  The government's failure to provide notice automatically enrolled the plaintiff in the benefit program.  Id.

The plaintiff characterized her claim as a continuing claim accruing monthly each time she did not receive the survivor's benefit.  Id.  The Federal Circuit disagreed, holding that her claim accrued only once, when her husband died.  Id.  All of the requisite elements of her claim—her husband's "prior military service, the government's failure to notify his wife of his election not to participate [in the survivor's benefit program], and his death"—fixed the government's liability at that time.  Id.  The Federal Circuit concluded that "[b]ecause all events necessary to her benefits claim had occurred when her husband died, . . . plaintiff's claim for [survivor's] benefits [was] not a 'continuing' claim."  Id.

In light of the holding in Hart, Mr. Angel's contentions do not constitute a continuing claim.  Although he deems the government to have breached an implied-in-fact contract or other duties each quarter since January 2013, the adoption of the Third Amendment in August 2012 and the nonpayment of dividends to Mr. Angel in January 2013 established all of the elements of his claims against the United States.  He could not sit on his rights and wait until August 8, 2022, to file suit in this court.  See id. ("A person . . . who has a claim against the government must file suit in the same timely manner that the government must file suit on its own claims against its citizens.").

The holdings in Brown Park and Ariadne confirm that Mr. Angel's contentions do not constitute a continuing claim.  In Brown Park, it was the government's failure to make rent adjustments to housing subsidies in particular years that determined the accrual of the plaintiffs' claims, not the lingering aftereffects—the diminished housing subsidies paid in later years— resulting from those failures.  See 127 F.3d at 1459 (stating that it was the government's "failure to make rent adjustments at the specified times . . . , and the consequential damages resulting from that failure, that constitute the actionable wrong that appellants seek to vindicate[, so] [t]his is not a case of recurring, individual actionable wrongs").  In Ariadne, the plaintiffs sought to assert claims for each year that the government breached its contractual duty to allow for an asset's use in meeting capitalization requirements, but the Federal Circuit held, instead, that because "[t]here was a single repudiation by which the government made clear its intent to reject the terms of the contracts," the continuing claim doctrine did not apply.  133 F.3d at 879.  The plaintiffs' claims were time-barred because they were "based on a single distinct event which ha[d] ill effects that continue[d] to accumulate over time."  Id.  Here, too, Mr. Angel's claims do not benefit from the continuing claim doctrine because by early 2013 all of the elements of his claims had occurred and he could have filed suit.

**B.  All of Mr. Angel's Claims, Even if Timely Filed, Would Be Foreclosed by Fairholme and Other Authorities**

Although all of Mr. Angel's claims must be dismissed for lack of jurisdiction because they are untimely, the court, in the alternative, finds that these claims are also subject to

dismissal for failure to state a claim upon which relief could be granted under RCFC 12(b)(6), or for distinct jurisdictional grounds under RCFC 12(b)(1).  The court addresses each count of the complaint in turn.

### 1.  Count I

The claim in Count I is premised upon an implied-in-fact contract between Mr. Angel and the United States guaranteeing the dividend rights of shareholders, under which Treasury had a duty to not interfere with quarterly dividend determinations by the boards of the Enterprises.  According to Mr. Angel, Treasury breached this duty "by instructing the [boards] of Fannie Mae and Freddie Mac to disregard Plaintiff's contract dividend rights by not considering whether to request Treasury approval of a declaration of a Junior Preferred stock dividend for that fiscal quarter."  Pl.'s Resp. 1.  This claim was not directly addressed in the Fairholme decision.

Nonetheless, that binding precedent restates the elements required to establish an implied-in-fact contract:  "(1) mutuality of intent to contract; (2) consideration; and (3) unambiguous offer and acceptance."  Fairholme, 26 F.4th at 1293 (citing City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)).  In his response brief, plaintiff argues that these elements of contract formation have been met:

> [T]he Government showed mutuality to contract by offering an implicit guarantee of Junior Preferred dividend rights. . . .  Plaintiff alleges []that the parties exchanged consideration[]—that Plaintiff bought Junior Preferred stock []in exchange for the Government's promise[] to guarantee dividend rights.  Under Plaintiff's theory, the Government []extended an offer for a unilateral contract[] that government-regulated financial institutions and individuals like Angel could accept by buying Fannie Mae and Freddie Mac Junior Preferred stock.

Pl.'s Resp. 25.  There is no plausibility, however, in Mr. Angel's allegations of an implied-in-fact contract whereby the United States guaranteed the payment of dividends to the holders of Junior Preferred shares in the Enterprises and also specifically promised to not interfere in the quarterly declaration of dividends by the Enterprises.

Mr. Angel relies on public statements of government officials in 2008, and market perceptions of the special nature of shares in the Enterprises, to establish the government's offer of a guarantee of dividend rights.  Compl. ¶¶ 4-5, 33 & n.7.  Since 1992, however, the United States has explicitly disavowed any Treasury guarantee of the shares or obligations of the Enterprises.  See 12 U.S.C. §§ 4501(4) (stating that "neither the [E]nterprises . . . , nor any securities or obligations issued by the [E]nterprises . . . , are backed by the full faith and credit of the United States"), 4503 ("This chapter may not be construed as obligating the Federal Government, either directly or indirectly, to provide any funds to [Fannie Mae or Freddie Mac], or to honor, reimburse, or otherwise guarantee any obligation or liability of [Fannie Mae or Freddie Mac].").  Accordingly, it is not plausible that a federal official could have offered a guarantee that is explicitly disavowed by statute, nor is it plausible that any investor could have

interpreted the public statements of federal officials or market perceptions regarding shares in the Enterprises as overriding the express statutory disavowal of any guarantee by Treasury concerning the shares and obligations of the Enterprises.  See, e.g., Hercules Inc. v. United States, 516 U.S. 417, 427 (1996) ("The Anti-Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation." (citing 31 U.S.C. § 1341)); Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 383-84 (1947) (stating that the scope of a government officer's "authority may be explicitly defined by Congress or be limited by delegated legislation," that "everyone is charged with knowledge of the United States Statutes at Large," and that misleading, unauthorized statements by a government officer do not create liability on the part of the United States); Montilla v. United States, 457 F.2d 978, 986 (Ct. Cl. 1972) (stating that officers of the government have neither "the power nor the authority to waive or nullify the provisions of the statutes enacted by the Congress"); Schuhl v. United States, 3 Cl. Ct. 207, 212 n.8 (1983) (stating that pursuant to "a long-standing rule . . . that has been applied consistently and stringently by this court," the United States may not be bound in contract by an official acting beyond his authority).

Indeed, Mr. Angel has not identified any statement from Treasury officials constituting an unambiguous offer of a dividend guarantee or a promise of noninterference in the actions of the boards of the Enterprises.  One public statement quoted by Mr. Angel in his complaint addresses ambiguities in the public perception of a guarantee of shares in the Enterprises but makes no promise of a guarantee.  Compl. ¶ 5.  The only other public statement specifically relied upon by Mr. Angel also falls far short of an offer of a guarantee or promise:  "Contracts are respected in this country as a fundamental part of [the] rule of law."  Id. ¶ 33 & n.7.  Nowhere in the public statements referenced by Mr. Angel is there a plausible inference that there was a meeting of the minds between Treasury and the Enterprises' shareholders as to a guarantee of dividends or a duty on the part of Treasury to not interfere with the declaration of dividends by the boards of the Enterprises.  See Detroit Int'l Bridge Co. v. United States, 32 Fed. Cl. 225, 230 (1994) (dismissing claim based on a purported implied-in-fact contract because the plaintiff failed to allege facts showing "a meeting of the minds as to specific contract terms"), aff'd, 64 F.3d 676 (Fed. Cir. 1995) (table).

Although the court has accorded the factual allegations of the complaint all favorable inferences, Mr. Angel has not alleged facts that plausibly support the formation of an implied-in-fact contract between Treasury and shareholders of the Enterprises.  No implicit guarantee of dividend rights is plausible, given the statutes governing Treasury officials and the absence of a meeting of the minds, and there is no allegation that supports a meeting of the minds as to Treasury's purported duty to not interfere in the declaration of dividends by the boards of the Enterprises.  Because the government's offer to enter into an implied-in-fact contract must be "unambiguous," Fairholme, 26 F.4th at 1293, the breach-of-contract claim in Count I is not plausible and would necessarily be dismissed under RCFC 12(b)(6).

### 2.  Count II

Mr. Angel's implied covenant claim in Count II posits that Junior Preferred shareholders in the Enterprises were guaranteed dividends by the United States, and that Treasury's bad-faith

conduct deprived him of the fruits of his implied-in-fact contract with the United States.  This claim was not directly addressed in the <u>Fairholme</u> decision.  The implied covenant of good faith and fair dealing, however, is a covenant that is implied only when a contractual relationship exists.  <u>See, e.g.</u>, <u>Scott Timber Co. v. United States</u>, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (stating that the implied covenant of good faith and fair dealing "depends on the existence of an underlying contractual relationship" (quoting <u>Mountain Highlands, LLC v. Hendricks</u>, 616 F.3d 1167, 1171 (10th Cir. 2010))); <u>Brenes v. United States</u>, 152 Fed. Cl. 365, 370 (2021) (holding that the plaintiff's claim for breach of the implied covenant of good faith and fair dealing "must fail" because there was no contractual agreement between the parties).  Here, as noted above, there is no plausible allegation that an implied-in-fact contract existed between Treasury and Mr. Angel so as to provide him a guarantee of his dividend rights.

Because the underlying contractual relationship asserted by Mr. Angel is not plausible, any implied covenant of good faith and fair dealing is also not plausible.  Although the court has accorded the factual allegations of the complaint all favorable inferences, there is no plausible claim in the complaint for a breach by the United States of an implied covenant of good faith and fair dealing.  The claim in Count II would also necessarily be dismissed under RCFC 12(b)(6).

### 3.  Count III

The claim in Count III of Mr. Angel's complaint is linked to the role of the United States in the conservatorships of the Enterprises.  Compl. ¶¶ 55-56; Pl.'s Resp. 1.  While suffering from a lack of clarity, the claim appears most likely to sound in breach of fiduciary duty or breach of contract.  The court therefore addresses both possibilities, and then addresses whether any discernable illegal exaction claim could withstand defendant's motion to dismiss.

### a.  Breach of Fiduciary Duty

A claim for breach of fiduciary duty may proceed in this court if the fiduciary duty is imposed on the government by a money-mandating statute or regulation or, alternatively, by a contract.  <u>See</u> <u>Hopi Tribe v. United States</u>, 782 F.3d 662, 666-67 (Fed. Cir. 2015) ("To establish that the United States has accepted a particular fiduciary duty, [a plaintiff] must identify statutes or regulations that both impose a specific obligation on the United States and 'bear[] the hallmarks of a conventional fiduciary relationship.'" (second alteration in original) (quoting <u>United States v. Navajo Nation</u>, 556 U.S. 287, 301 (2009))); <u>Cleveland Chair Co. v. United States</u>, 557 F.2d 244, 246 (Ct. Cl. 1977) ("[P]laintiffs' claim for damages arising out of defendant's breach of a fiduciary duty must be grounded in a contractually based obligation to plaintiffs to succeed here.").

The Federal Circuit in <u>Fairholme</u> directly addressed claims that the United States, while acting as conservator of the Enterprises, breached its fiduciary duties to the Enterprises' shareholders.  26 F.4th at 1296-99.  The Federal Circuit held that the government "owed no fiduciary duties to the shareholders under HERA" because that statute permits the government to "act without regard to the best interests of the shareholders."  <u>Id.</u> at 1297-98 (citing 12 U.S.C. § 4617(b)(2)(J)).  The Federal Circuit also held that the shareholder plaintiffs had failed to

identify any fiduciary duty on the part of the United States established by contract.  Id. at 1298.
Thus, the Federal Circuit affirmed this court's dismissal of shareholder breach-of-fiduciary-duty
claims for lack of subject-matter jurisdiction.  Id. at 1298-99.

    The holding in Fairholme that the government "owed no fiduciary duties to the
shareholders under HERA," id. at 1297, compels the dismissal of shareholder breach-of-
fiduciary-duty claims based on HERA brought in this court as beyond the court's subject-matter
jurisdiction.  In his complaint, Mr. Angel recognized HERA's role in the establishment of the
conservatorships for the Enterprises.  Compl. ¶¶ 53-54.  Thus, in addition to being untimely, Mr.
Angel's claim for breach of fiduciary duty in Count III, to the extent that the text of the
complaint identifies such a claim, would necessarily be dismissed under RCFC 12(b)(1) for lack
of subject-matter jurisdiction.[6]

### b.  Breach of Contract

    The text of Count III of the complaint also could be read to include a restatement of the
claims in Count I and Count II:

        Treasury engaged in wrongful acts in conducting the Conservatorship, by
        each quarter directing and otherwise causing [the Enterprises' boards] to disregard
        Junior Preferred contractual payment rights and effecting quarterly outsized
        sweeps of [the Enterprises'] profits, inclusive of approximately $20 billion of
        Junior Preferred share contractual dividend rights to itself.

Id. ¶ 56.  The incorporation in Count III of the breach claim in Count I is further implied in Mr.
Angel's response brief:  "Plaintiff also alleges in Count III of the Complaint that the Treasury
engaged in wrongful acts in conducting the Conservatorship of the [Enterprises] by causing their
[boards] to disregard the contractual payment rights of Junior Preferred Shareholders."  Pl.'s
Resp. 1.  To the extent that Count III of the complaint is a reiteration of the claims found in
Count I and Count II, Mr. Angel's claim for "wrongful acts" in Count III, Compl. 15, would
necessarily be dismissed under RCFC 12(b)(6) for lack of plausibility, just as Count I and Count
II would be dismissed for this reason.

### c.  Illegal Exaction

    Finally, the court addresses the language in the complaint and in Mr. Angel's response
brief that suggests that the claim in Count III might be an illegal exaction claim.  "[A]n illegal
exaction claim may be maintained when 'the plaintiff has paid money over to the Government,

---

    [6] If, instead, Mr. Angel relies on a fiduciary duty established by contract, such a duty
would lack plausibility because there is no plausible contract between the United States and Mr.
Angel identified in the complaint, even when the complaint is accorded all favorable inferences.
See supra Section III.B.1.  Any breach-of-fiduciary-duty claim founded on a purported implied-
in-fact contract between the government and Mr. Angel would necessarily be dismissed under
RCFC 12(b)(6).

directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967)).

As noted above, Mr. Angel uses language in his complaint and response brief suggestive of an illegal exaction claim. For example, he references a "5th amendment illegal extraction" in his complaint, Compl. ¶ 7 n.4, and the significance of the Due Process clause of the Fifth Amendment to illegal exaction claims is well established, e.g., Casa de Cambio Comdiv, 291 F.3d at 1363; Flint v. United States, 162 Fed. Cl. 91, 136 (2022); Gulley, 150 Fed. Cl. at 415 n.3; Grooms v. United States, 113 Fed. Cl. 651, 666 (2013); Gahagan v. United States, 72 Fed. Cl. 157, 162-63 (2006); First Fed. Sav. & Loan Ass'n of Rochester v. United States, 59 Fed. Cl. 667, 670 (2004). In addition, Mr. Angel employs the concept of "wrongful quarterly extractions" to describe the effects of the net worth sweep, Pl.'s Resp. 1, 4, and the adjective "wrongful" is routinely associated with illegal exaction jurisprudence, see, e.g., Longshore v. United States, 77 F.3d 440, 441 (Fed. Cir. 1996) (considering a claim for wrongful exaction); N. Cal. Power Agency v. United States, 122 Fed. Cl. 111, 116 (2015) (describing illegal exaction claims as focusing on "wrongful or illegal action by the Government"). Similarly, the question of whether a government action was unauthorized is a key element of illegal exaction jurisprudence, see, e.g., Aerolineas Argentinas, 77 F.3d at 1578, and in Count III Mr. Angel describes the net worth sweep as "unauthorized," Compl. ¶ 57. And, when asserting that this court possesses jurisdiction over his wrongful extraction claim, Mr. Angel argues that his claim is akin to the illegal exaction claim pled in another case before this court. Pl.'s Resp. 4 (citing Owl Creek Asia I, 148 Fed. Cl. at 640). Thus, construing the allegations in the complaint in Mr. Angel's favor, the claim in Count III might be one for an illegal exaction.

In defendant's motion to dismiss, however, Mr. Angel was informed that binding Federal Circuit precedent forecloses any illegal exaction claims brought against the United States by shareholders of the Enterprises. Def.'s Mot. 25-26 & n.7. This is a correct statement of the law. The Federal Circuit held in Fairholme that the Enterprises' shareholders could not assert illegal exaction claims because such claims belong to the Enterprises. 126 F.4th at 1291-92. If Mr. Angel's claim in Count III is a claim seeking recovery for an illegal exaction, or for quarterly illegal exactions, under binding precedent it fails to state a claim upon which relief can be granted and would necessarily be dismissed under RCFC 12(b)(6).[7]

## IV. CONCLUSION

---

[7] Mr. Angel also cannot maintain an illegal exaction claim because in his complaint he nowhere states that his claim is for money that he paid to the Enterprises or to the United States. See, e.g., Piszel v. United States, 833 F.3d 1366, 1382 (Fed. Cir. 2016) (stating that there can be no illegal exaction where there was no payment from the plaintiff to be recovered (citing Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 153 (2002))); Tex. State Bank v. United States, 423 F.3d 1370, 1380-81 (Fed. Cir. 2005) (stating that "[t]here can be no illegal exaction or due process violation if the money exacted was never the property of [the plaintiff]").

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive or unnecessary for resolving the issues currently before the court.

As set forth above, all of Mr. Angel's claims are barred by the statute of limitations, and must therefore be dismissed for lack of jurisdiction.  In addition, if it were not time-barred, any breach claim in Count III of the complaint founded upon a fiduciary duty established by statute would be dismissed for lack of subject-matter jurisdiction because no statute imposes such a duty on the United States.  Mr. Angel's remaining claims, if not time-barred, would be subject to dismissal for failing to plausibly state a claim upon which relief could be granted.

The court therefore **GRANTS** defendant's motion to dismiss and **DISMISSES** all of Mr. Angel's claims for lack of jurisdiction, **WITHOUT PREJUDICE**, as untimely.  The clerk shall enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge

-20-